**David O. SOLMITZ, et al.**

v.

**MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 59 et al.**

Supreme Judicial Court of Maine.

Argued April 29, 1985.

Decided July 12, 1985.

Jim Mitchell and Jed Davis P.A., By Jed Davis (orally), Augusta, for plaintiffs:

Margaret Ratner, Sarah Wunsch, Anne Simon, New York City, amicus curiae for

The Center for Constitutional Rights, The American Friends Service Committee, and Tolerance Day Advocates.

Abby R. Rubenfeld, New York City, amicus curiae, for Lambda Legal Defense and Education Fund, Inc.

Daniel P. McIntyre, Augusta, amicus curiae, for Maine Teachers Ass'n.

Robert Mittel, Portland, J. Marc Abrams, Washington, D.C., amicus curiae, for Student Press Law Center.

Jensen Baird Gardner & Henry by Merton Henry (orally), Brian C. Shaw, Portland, for defendants.

Cuddy & Lanham by Samuel W. Lanham, Jr., Bangor, amicus curiae, for Christian Civic League of Maine.

Brann & Isaacson by George S. Isaacson, Martin I. Eisenstein, Lewiston, amicus curiae, for Maine School Management Ass'n.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, GLASSMAN, and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Plaintiffs David O. Solmitz, Sonja Roach, and Dale McCormick appeal an order of the Superior Court (Kennebec County) denying injunctive relief that would have permitted a "Tolerance Day" program to be held at Madison High School in School Administrative District No. 59 (S.A.D. 59). Plaintiffs argue that the cancellation of the proposed program by the Board of Directors of S.A.D. 59 (the Board) violated the rights of each of the plaintiffs to freedom of speech under the first amendment of the United States Constitution and under article I, § 4 of the Maine Constitution. Plaintiffs also contend that the action of the Board violated homosexuals' right to equal protection of the laws. After full consideration of all of these contentions, we find no reversible error in the judgment of the Superior Court.

In the fall of 1984, David Solmitz, a teacher at Madison High School, began planning an all-day "Symposium on Tolerance" in reaction to the tragic drowning of a Bangor homosexual by three Bangor high school students. Tolerance Day, as the program became known, was designed to bring to the school representatives of some dozen different groups who have experienced prejudice in society. The program, to begin with a school-wide assembly, would replace scheduled classes throughout the school day on Friday, January 25, 1985.

On January 14, Solmitz met with the school's principal, Anthony Krapf, to discuss the proposed symposium. At that meeting, Krapf instructed Solmitz that he should not invite a homosexual to speak at Tolerance Day. The next day the two men met with Robert Woodbury, superintendent of S.A.D. 59, who also advised Solmitz that he should not include a homosexual in the program. On Friday, January 18, Solmitz and Woodbury reached a compromise whereby Dale McCormick, a lesbian who had agreed to speak at Tolerance Day, would participate in the symposium. As modified, the program would begin with a mandatory assembly of all students at which a speaker would discuss the issue of tolerance in general and the representatives of the various groups would be introduced. Those representatives would then disperse to different classrooms, and each would speak separately for two class periods. The students would have the option of attending such sessions as they might choose or of attending a study hall.

While he was negotiating with school administrators from January 15 through 18, Solmitz obtained counsel who scheduled a court date for a hearing seeking injunctive relief. News of the proposed symposium appeared in the local papers on Saturday morning, January 19, and during the weekend school administrators and school board members received fifty or more telephone calls and visits from people critical of McCormick's scheduled appearance. Some callers suggested that picketing might occur on the day of the program, and some parents threatened to keep their chil-

dren out of school, or to attend school themselves to monitor the symposium. A few of the phone calls warned the Board to expect bomb threats against the school and sabotaging of the school furnace if the program were held.

As a result of those calls, the Board of S.A.D. 59 decided to discuss the Tolerance Day program at its regular meeting set for Monday evening, January 21. At the outset of the meeting Superintendent Woodbury summarized the events of the preceding several days and reported on the threats of disruption at the school. The Board members then went into executive session to discuss the issue; and when they resumed the open meeting, they voted unanimously to cancel Tolerance Day because of concerns they had about the effect the program would have on the "safety, order, and security" at Madison High School.

On the next day, January 22, Solmitz, McCormick, and Sonja Roach, a freshman student in Solmitz's history class, filed the present suit against S.A.D. 59, as well as against all members of the Board, Woodbury, and Krapf, personally and in their official capacities. The complaint, brought both under 42 U.S.C. § 1983 (1981) and M.R. Civ. P. 80B, alleged that defendants had violated plaintiffs' constitutional rights by cancelling the Tolerance Day symposium, and sought preliminary and permanent relief allowing the full program to proceed on the scheduled date of January 25. The Superior Court heard the motion for a temporary restraining order on January 23 and

denied the motion the following day. A full hearing took place on February 8 and 11, and the trial justice promptly issued his judgment denying injunctive relief on February 14. On appeal we limit our inquiry to the narrow issue of whether the Board [1] acted impermissibly in cancelling Tolerance Day. We hold that the Board did not violate any constitutional rights[2] by its actions, and we deny plaintiffs' appeal.[3] We also deny all parties' motions for attorney's fees.

## I. *Freedom of Speech*

When the Board of Directors of S.A.D. 59 cancelled the proposed Tolerance Day symposium, it acted within its broad power to manage the curriculum of the Madison schools. Although we wholeheartedly endorse the statement of the United States Supreme Court that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. DesMoines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969),[4] that principle does not require a court to overturn the decision of the Board in this case.

■ It is beyond question that "local school boards have broad discretion in the management of school affairs." *Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (hereinafter *Pico*). In Maine local control over education is established by article VIII, § 1 of our constitution,

---

1. We need not consider the actions of the school administrators named as defendants. Superintendent Woodbury and Principal Krapf agreed to let McCormick speak at the compromise program, and in any event, any decision they made was overruled and superseded by the decision of the Board.

2. Although much of the following discussion is phrased in terms of the first amendment to the United States Constitution, the Maine Constitution, art. I, § 4, "Every citizen may freely speak," is equally applicable. *See State v. John W.,* 418 A.2d 1097, 1101 (Me.1980) (Maine Con-

stitution no less restrictive than the Federal Constitution).

3. Plaintiffs assert a variety of other errors by the trial court. Careful consideration does not reveal any merit in those contentions.

4. *See also National Gay Task Force v. Board of Educ. of Oklahoma City,* 729 F.2d 1270 (10th Cir.1984), *aff'd mem.,* — U.S. —, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985) (striking down as overbroad a statute limiting teacher's right to advocate, encourage, or promote homosexual activity).

providing that "the legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools ...." Moreover, 20–A M.R.S.A. § 2(2) (1983) provides:

It is the intent of the Legislature that the control and management of the public schools shall be vested in the legislative and governing bodies of local school administrative units, as long as those units are in compliance with appropriate state statutes.

Additionally, 20–A M.R.S.A. § 1001(6) (1983) requires that the school board "shall direct the general course of instruction." In the case at bar, plaintiffs could make no realistic claim that the Tolerance Day program was anything other than a proposed addition to the course of instruction at Madison High School. Even the compromise Tolerance Day program would have required all students to attend a morning assembly and would have displaced the school's regular classes for part of the day. We must address the arguments of the teacher Solmitz, the student Roach, and the speaker McCormick, in the context of the broad discretion granted school boards in discharging their responsibilities for the curriculum of public schools.

### A. David O. Solmitz

■ Plaintiff Solmitz argues that the Board's rejection of his plans for a school-wide Tolerance Day program violated his rights to academic freedom under the first amendment. *See Keyishian v. Board of Regents of the University of the State of New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) ("[academic] freedom is ... a special concern of the First Amendment"). Solmitz, however, does not, nor could he, contend that the Board's veto infringed in any way upon his right to teach his assigned courses as he deemed appropriate, or to express himself freely on tolerance, prejudice against homosexuals, or any other subject. However broad the protections of academic freedom

may be, they do not permit a teacher to insist upon a given curriculum for the whole school where he teaches. The facts as found by the Superior Court demonstrate beyond any doubt that Tolerance Day was designed by Solmitz to add to the school-wide curriculum of Madison High School. No right of Solmitz to speak freely was violated by the Board's decision to veto his curriculum proposal, and in cancelling the symposium the Board acted well within the permissible range of its discretion to direct the general course of instruction in S.A.D. 59.

■ We stress that in this case there is no indication that the Board was attempting to "cast a pall of orthodoxy over the classroom," *Keyishian v. Board of Regents*, 385 U.S. at 603, 87 S.Ct. at 683, or to restrict impermissibly the marketplace of ideas within the high school. *See Pico*, 457 U.S. at 871, 102 S.Ct. at 2810. The Superior Court justice found as a fact that "concerns about disruptions [by those opposed to having a homosexual speak] and the fact that such disruptions might make Tolerance Day 'a lost day educationally' ... were the *decisive factors* in the decision to vote to cancel." (Emphasis added) The justice further found that "concerns about disruption of educational activities, *not desire to suppress ideas*," motivated the Board to cancel the proposed Tolerance Day program; "concerns directed at potential disruption ... were the *actual* factors leading to the cancellation." (Emphasis added) There is no reason to disturb those findings. Factual determinations by a trial justice will not be reversed on appeal unless they are clearly erroneous; that is, unless there is *no* competent evidence in the record to support those findings. *Harmon v. Emerson*, 425 A.2d 978, 981–82 (Me.1981). In this case there was a great deal of testimony to support the trial justice's factual determinations. Six of the nine members of the Board testified at the hearing that they voted to cancel the program because they feared that holding the symposium would result in a serious dis-

ruption of the educational process at Madison High School.[5]

■ Despite the Superior Court's unequivocal factfinding as to the actual motive of the Board, plaintiffs urge that we overrule the trial court and find on our own that the true motive that prompted the Board to cancel Tolerance Day was that of the townfolk who were opposed to having a homosexual appear at the school. We decline to take the novel step of declaring that a permissible decision of elected officials is infected with the invidious motives of their constituents. Plaintiffs have cited no authority from this, or any other jurisdiction, to support their demand that we delve into the minds of citizens who lobbied their elected officials. Indeed, courts are generally hesitant to require even the decisionmakers themselves to explain in court testimony the motivation of their official actions. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Frye v. Town of Cumberland,* 464 A.2d 195, 200 (Me.1983). It was entirely appropriate for the Superior Court to refuse to substitute the motives of the complaining citizens for those of the Board.

■ The Board of S.A.D. 59 responded reasonably when faced with the prospect that the educational processes at Madison High School would be seriously disrupted if the Tolerance Day program was held. The Board has wide latitude in managing the curriculum of its schools, and its most basic obligation is to maintain order in the schools and to create a stable environment for the education of its students. Even in cases where first amendment rights are *directly implicated,* a school board may act to restrict protected speech or conduct

that "materially disrupts classwork or involves substantial disorder." *Tinker v. Des Moines,* 393 U.S. at 513, 89 S.Ct. at 740. Surely then, in the present case the Board could permissibly veto a teacher's proposed addition to the curriculum that threatened to force the entire school to suffer "a lost day educationally." This court cannot fault the decision of the Board in the face of likely bomb threats,[6] a threatened sabotage of the school's heating plant in the middle of the Maine winter, and the numerous parents expected to keep their children at home or to picket the school on Tolerance Day.

In announcing our decision in the case at bar, we stress what this case does *not* involve. The Board did not attempt to discipline Solmitz for proposing and organizing the Tolerance Day symposium. It did not tell Solmitz how he was to teach his history course. It did not restrict Solmitz in any way in freely expressing his views on any subject within or without the school. Similarly, the Board did not prohibit any other discussions of tolerance or of prejudice against homosexuals, whether in Solmitz's classes or otherwise within Madison High School. When the Board cancelled a proposed forum disruptive to the education of its students, it exercised its responsibility for directing the course of instruction of the school. That action did not infringe on the rights of teacher Solmitz and did not impermissibly restrict the free marketplace of ideas at Madison High School.

### B. *Sonja Roach*

■ The free speech rights of Sonja Roach, a student of Solmitz, similarly were not violated by the action of the Board.[7] Students have no right to demand a curric-

---

5. The parties stipulated that the three Board members who did not testify at the hearing would have testified to the same effect as did the six who did testify.

6. The Superior Court received testimony that it was standard practice, upon receiving a bomb threat, to evacuate the school for one hour to permit a search of the building.

7. It is beyond question that if Solmitz or McCormick has a right to speak at the school, Roach has a right to hear them. We focus our analysis on the question whether a student asserting her own rights can compel the presentation of a Tolerance Day program.

ulum of their own choice. In the *Pico* case, 457 U.S. 853, 102 S.Ct. 2799, the various opinions of the justices demonstrate that at least five members of the United States Supreme Court believe that the right to receive information as a component of the first amendment does not allow students to insist upon a given curriculum.[8] *See Seyfried v. Walton,* 668 F.2d 214 (3d Cir.1981) (production of the musical "Pippin" was part of the curriculum and could be cancelled over students' objections). We follow their analysis in interpreting article I, § 4 of the Maine Constitution.

■■■ Again, we stress that the findings of the Superior Court that we have ruled to be beyond reversal on appeal demonstrate that Tolerance Day was cancelled for safety, order, and security reasons, and not in an attempt to cast a "pall of orthodoxy" over the school. Sonja Roach has no right to impose upon the Board her ideas for the curriculum at Madison High School, and none of her freedoms under article I, § 4 of the Maine Constitution or the first amendment was in any way infringed by the action of the Board.

## C. *Dale McCormick*

■■■ Plaintiff Dale McCormick has no right to speak at Madison High School arising from the invitation she received from Solmitz, and she could demand successfully to address the student body only if the school had become a public forum. *See Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). We

hold that Madison High School is not a public forum, and deny this plaintiff's appeal.

In *Perry* the Supreme Court described the circumstances under which government property becomes a public forum. After discussing traditional public forums such as streets and parks, the Court stated:

A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.

8. In *Pico* only three justices in the plurality explicitly found that "the right to receive ideas follows ineluctably from the *sender's* First Amendment rights to send them .... [And that] the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech ...." 457 U.S. at 867, 102 S.Ct. at 2808 (emphasis in original). The four-judge dissent wrote that a student should not be able to force a school "to be the conduit for [any] particular information." *Id.* at 889, 102 S.Ct. at 2819 (Burger, C.J., dissenting). And Justice Blackmun, while concurring with the plurality, wrote: "I do not suggest that the State has any affirmative obligation to provide stu-

dents with information or ideas, something that may well be associated with a 'right to receive'." *Id.* at 878, 102 S.Ct. at 2814 (Blackmun, J., concurring). Justice White also concurred separately in the judgment affirming the court of appeals' reversal of the grant of summary judgment by the district court, but he did not discuss the first amendment question. *Id.* at 883, 102 S.Ct. at 2816 (White, J., concurring). *Pico* was limited to the removal of library books from the school, and even the plurality opinion recognized the broad power of school boards in controlling curriculum. *See id.* at 862, 869, 102 S.Ct. at 2805, 2809.

*Id.* at 45–46, 103 S.Ct. at 955 (citations omitted).

Plaintiffs assert that Madison High School was a limited public forum where McCormick had a right to speak and that, even if the property was not open to the public, the action of the school board was an attempt to suppress the lesbian speaker's view. Neither of these arguments successfully impugns the ruling of the Superior Court that the Board did not violate McCormick's fundamental freedoms when it cancelled Tolerance Day.

 In arguing that the high school was a limited public forum, plaintiffs contend that school policy encouraged the use of outside speakers, that Solmitz had invited a number of speakers to the school in the past, and that the Board had allowed the prior programs without comment.[9] These assertions do not demonstrate that the school, as opposed to an individual classroom, was open to all speakers invited by a faculty member. The school policy statement introduced into evidence by plaintiffs does state that "controversial questions shall have a legitimate place in the work of the public schools," but the same statement is explicit that "no individual or group may claim the right to present arguments directly to students." Solmitz had invited a score or more speakers to the school during his 16 years of teaching,[10] and those individuals had spoken without prior approval of the Board. An average of one or two speakers per nine-month school year, with almost none addressing more than a single class, does not make the high school a "public property that the state has opened for use by the public as a place for expressive activity." Similarly, the lack of involvement by the Board in the past presentations does not mean that the school was not "reserved for its intended purpose." It is clear that the S.A.D. 59

Board only became concerned with Solmitz's program when public reaction to the proposed speakers threatened to disrupt the educational process. The purpose of Madison High School is to educate the youth of the community. The use in the past of an occasional outside speaker to accomplish that end does not create an independent right in any speaker who wishes thereafter to address the students in their classrooms.

 In addition, based on the findings of the Superior Court, we are unable to hold that the Board acted to suppress a point of view to which its members were opposed. The Board cancelled the *entire* program in the face of threats of disruptive activity by some members of the community. As discussed fully above, the action of the Board of S.A.D. 59 was not taken to forbid the discussion of any issue or point of view at Madison High School. The Board's cancellation of Tolerance Day did not violate the free speech rights of Dale McCormick.

## II. *Equal Protection*

 Plaintiff McCormick also argues that, contrary to the ruling of the court below, homosexuals constitute a specially protected class and that the cancellation of Tolerance Day violated their right of equal protection of the laws. Whether the attack is grounded in article I, section 6–A of the Maine Constitution or in the counterpart provision of the federal constitution, we affirm the Superior Court in rejecting her contention of invidious discrimination. Even if she were a member of a specially protected class, McCormick suffered no discrimination. She was not the only Tolerance Day speaker prevented from speaking. Nor did the Board members act out of a desire to suppress McCormick's ideas. On the contrary, they were concerned with

---

**9.** Plaintiffs also assert that the program was part of an ongoing humanities program funded by the State. There is no evidence in the record to support this contention.

**10.** Only one past program, however, was designed to displace the normal curriculum of the whole high school to the extent of Tolerance Day. Most of the speakers appeared only before Solmitz's classes.

protecting the education of the Madison students from disruption, and cancelled the entire Tolerance Day program solely to further that end.

### III. *Attorney's Fees*

 The Superior Court justice declined to rule on the parties' cross motions for attorney's fees "pending resolution of the appeal which is certain in this case." As a matter of general policy, we disapprove of such piecemeal disposition of any case. After deciding the merits of a section 1983 case, Superior Court judges should allow or deny attorney's fees when requested. It does not promote judicial economy to have cases come to the Law Court in bits and pieces. The Superior Court should avoid any practice that encourages appeal of some, but not all, of the issues in a lawsuit. *Cf. Cole v. Peterson Realty, Inc.*, 432 A.2d 752 (Me.1981) (dismissal of appeal because of improvident grant of M.R.Civ.P. 54(b) certificate).

Given our ruling on appeal, however, we find no need to remand this case to the Superior Court for disposition of the motions for fees. We deny plaintiffs' request for attorney's fees under 42 U.S.C. § 1988 (1981).[11] That section provides for the award of attorney's fees to "the prevailing party" in suits seeking to vindicate a party's rights under the federal civil rights laws. The plaintiffs have prevailed on none of their claims in this lawsuit, and thus the award of attorney's fees to them would be improper.

In their answer to plaintiffs' complaint, defendants sought a like award of attorney's fees. We similarly rule on defendants' request, deferred also by the Superior Court, and deny it as well. Although the defendants were the "prevailing parties" in this lawsuit, they are not entitled to an award of fees under section

1988. "[T]he standard for deciding a defendant's motion for attorney's fees is different from that used when a plaintiff has made the motion. For a defendant to succeed, he must show that plaintiff's claim 'was frivolous, unreasonable, or groundless, or that plaintiff continued to litigate after it clearly became so'." *Lotz Realty Co., Inc. v. United States Department of Housing and Urban Development*, 717 F.2d 929, 931 (4th Cir.1983) (citation omitted). *See Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (employing same standard under another similarly worded section of the civil rights laws). Plaintiffs' arguments in this lawsuit were not wholly without merit and they litigated their case fully, in a manner that was helpful to the courts. Accordingly, defendants are not entitled to an award of attorney's fees.

The entry is:

Judgment affirmed.

Remanded for entry of order denying the cross motions for attorney's fees.

All concurring.

---

**11.** *42 U.S.C. § 1988 states in pertinent part:*
In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.