Mary MAY, Plaintiff-Appellant,

v.

EVANSVILLE–VANDERBURGH SCHOOL CORP., et al., Defendants-Appellees.

No. 85–2234.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1986.

Decided April 1, 1986.

Rehearing and Rehearing En Banc Denied May 28, 1986.

Thomas S. Neuberger, Wilmington, Del., for plaintiff-appellant.

Robert P. Musgrave, II, Kightlinger, Young, Gray & DeTrude, Jeffrey R. Frank, Frank & Collins, Evansville, Ind., for defendants-appellees.

David J. Emmert, amicus curiae, for Indiana School Boards Ass'n.

Marc D. Stern, Lois C. Waldman, Ronald A. Krauss, New York City, Geoffrey Stone, Sylvia M. Neil, Chicago, Ill., amicus curiae, for American Jewish Congress.

Before POSNER, FLAUM, and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

Harper Elementary School (kindergarten through fifth grade) is a public school in southern Indiana with about 350 students and 30 teachers (including teachers' aides). Early in 1981 Mary May and two other teachers—all three evangelical Christians—began meeting every Tuesday morning at the school to pray, sing hymns, and discuss the Bible. Four or five other teachers later joined the group. The meetings were held between 7:25 and 7:45 a.m., before the school day began and before the teachers were required to report to their duty stations. Students were not allowed in the building this early and apparently were unaware of the meetings. In fact even the school administration didn't find out about the meetings until 1983, when a new principal started a teachers' newsletter and Mrs. May asked him to include a notice of the meetings in it. He not only refused but after consulting with his supervisors ordered the meetings to stop, and was backed up in this decision by the school board.

Mrs. May has sued the board, its members, and the superintendent of the school district under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, seeking to enjoin the ban on religious meetings and to recover $300,000 in damages. The only ground she has pressed is that the ban violates her constitutional right of free speech. Although freedom to express one's religious convictions (as distinct from freedom to debate religious doctrine, which was not the object of Mrs. May's meetings) might seem to nestle more comfortably within the First Amendment's free exercise of religion clause than its free speech clause, the Supreme Court has held that restrictions on devotional speech are actionable under the free speech clause. *Widmar v. Vincent*, 454 U.S. 263, 269 and n. 6, 102 S.Ct. 269, 274 and n. 6, 70 L.Ed.2d 440 (1981). Mrs. May makes no free exercise claim.

After some discovery, both sides moved for summary judgment. The district judge granted the defendants' motion and dismissed the complaint, finding that, "Although no written policy is evident, it appears from the record that the school board and the superintendent of schools had consistently applied a policy prohibiting use of school facilities for religious activity. At all times pertinent to this complaint, no religious meetings occurred on school property, at least to the knowledge of school administrators, and no meetings of teachers occurred at Harper School except for those necessary to the operation and management of the school.... If other teacher groups were permitted to meet on a variety of religious and non-religious subjects in the kind of formalized way Mrs. May's group met, there might be an argument that a public forum, or at least a limited public forum, existed in this case and that the exclusion of Mrs. May's group was some denial of constitutional rights. The record reveals no such scenario." 615 F.Supp. 761, 763–64 (S.D.Ind.1985).

Mrs. May makes two arguments on appeal. The first is that as an employee of the school she has a right to exercise free speech on school premises provided she

does not disrupt the school's activities; since the religious meetings took place before school began and the students neither participated in the meetings nor (so far as anyone knows) were even aware of them, there was no disruption. Her second argument is that even if the school authorities could have forbidden meetings not directly related to school business, they didn't do so. By allowing meetings on any subject except religion, they made the school a "public forum" between the time when it opened for teachers and the time the teachers had to report to their duty stations; and they could not arbitrarily exclude one subject of speech—religion—from the forum. To this the defendants reply that even if they created a public forum (which they deny), they were justified in excluding religious discussion from it, because to allow it would have violated the establishment clause of the First Amendment.

Mrs. May's first argument asks us to recognize a public employee's right to use his (or her) employer's premises for meetings on topics of public importance such as religion or politics. Her reply brief summarizes the nature and scope of the right contended for: "In essence, Plaintiff's theory is as follows. Regardless of the existence of a public forum, a teacher legitimately in the work place has an absolute right [by virtue of the free speech clause, the only constitutional provision on which she relies] to engage in free time religious speech and worship unless such speech materially and substantially interferes with a school's ability to fulfill its tasks. This right derives from the worker's status, as a public employee in a free society, which permits her to use leisure time as she chooses while properly in the work place." Mrs. May grounds this right in the principle that public employees have rights of free speech to the extent compatible with the effective performance of their jobs, see, e.g., *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985)—a principle that would indeed prevent the school authorities from forbidding Mrs. May to advocate, in her own time and in other places, political or

religious opinions of which they disapproved, unless they could show that such advocacy prevented her from doing her job. But these cases do not address the question whether a public employer must allow its employees to use its premises for meetings, whether before or during or after work, on matters personal to the employees and unrelated to the employer's business. *Piarowski v. Illinois Community College Dist. 515,* 759 F.2d 625, 629 (7th Cir.1985). The plaintiff in *Pickering* was a teacher who was fired for mailing a letter to a newspaper criticizing school officials for their handling of the school district's finances. In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the questionnaire for which the plaintiff was fired was probably circulated on the employer's premises but nothing is made of this in the opinions; the employer's defense (so far as relevant here) was that circulating the questionnaire was insubordinate and therefore disruptive. Our recent case of *Baz v. Walters,* 782 F.2d 701, 708 (7th Cir.1986), is similar.

Mrs. May certainly could not command the school board to keep the Harper School open at night free of charge so that she could hold prayer meetings or any other sort of meeting there without having to pay rent. If she had such a right it would mean that public employees had much greater rights of free speech than the rest of the community. They would have the guaranteed free use of their employers' premises for their speeches and meetings while private employees would have access for such purposes neither to those premises nor to their own employers' premises, except in the unlikely event that a private employer voluntarily permitted employees to use his premises for meetings unrelated to their work for him. This case is less extreme than our hypothetical case, however, because Mrs. May is not asking that the school be opened earlier or closed later. The school has to be open to teachers before the students are allowed into the building, to make sure that all the teachers are at their duty stations when the students arrive. The premises are not fully utilized

during this interval and all Mrs. May wants to do is to take up some of the slack, as it were, by using for prayer, hymns, and religious discussion a classroom or other room (most of the meetings occurred in the guidance counselor's office) not otherwise used during this time for anything at all. The marginal cost of her use is (she might argue) zero.

But the objection to forcing an employer to allow his premises to be used for meetings by employees has deeper roots than the marginal costs in electricity or maintenance that such use might impose. There is a potential distortion of the market in ideas if public employees are given greater rights of free expression than private employees by having a right of free access to their employers' premises for meeting purposes; and although the practical significance of such access may be small in this case as we shall see, it could be great in other cases. There is also a potential distortion of the market in ideas if employers are involuntarily identified with particular views by being compelled to sponsor meetings at which those views are advocated.

██ Regarding the first point, we acknowledge that cases such as *Pickering* and *Connick* give public employees greater rights of free speech than private employees have, but this is not just for the formalistic reason, which would be as applicable to the present case as to those cases, that the First Amendment restricts only state action, and not private action. The behavior of public enterprises is a political question; political speech has been placed at the top of the hierarchy of speech protected by the First Amendment; and since the employees of public enterprises have insights and information about the conduct of the enterprise that the private citizen lacks, they have a distinctive contribution to make to political speech. Consistently with this analysis, the public employee's right of free speech has been limited to subjects of public concern. See, e.g., *Connick v. Meyers, supra,* 461 U.S. at 145, 103 S.Ct. at 1689. Mrs. May might have a distinctive contribution to make to the public discussion of the policies or management of the

public schools of Evansville if her group were discussing those subjects, but instead its meetings are devoted to matters unrelated to the schools. Anyway the First Amendment right of a public employee to criticize his employer has not been thought to include a right to commandeer the employer's premises as a soapbox for his criticisms.

The costs in frayed public relations of entangling a public enterprise in controversies sparked by its employees' use of its property as a site for speeches and meetings provide a distinct ground for doubting the existence of the broad right that Mrs. May claims. In upholding the right of a school board to bar a student organization from using the school's athletic field to hold a "peace fair," which the board resisted because it wanted to keep "the 'podium of politics off school grounds,'" the Third Circuit held recently that the "desire to avoid potentially disruptive political controversy and to maintain the appearance of neutrality is sufficient justification for excluding speakers from a nonpublic forum." *Student Coalition for Peace v. Lower Merion School Dist.,* 776 F.2d 431, 437 (3d Cir.1985), citing *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion). Cf. *Greer v. Spock,* 424 U.S. 828, 839, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976). This language describes the present case as well. And even if the school authorities could maintain the appearance of their own neutrality—could quiet the suspicions of parents and taxpayers—we can easily imagine the destruction of the school's peaceful atmosphere as fundamentalists and atheists, conservatives and radicals, pro-abortionists and anti-abortionists form into groups and hold meetings at the school before school opens and after school closes and during lunch breaks, coffee breaks, and free periods. This is not the American tradition in public elementary education, and is not the First Amendment's command.

██ It is for the foregoing reasons and not because we hold property rights to be sacred (and anyway it is public not private

property that the plaintiff wishes to conscript) that we have concluded that the controlling principle in this case should be that the workplace is for working and not, unless the employer consents, for holding meetings at which employees can discuss matters of great importance to themselves, perhaps to society as a whole, but not to the employer.

Of course no one in this country works every minute of the workday and no employer tries to prevent his employees from engaging in private conversations during the workday—conversations that may touch on political or religious matters—as long as the conversations do not interfere with the employees' work. If a public employer made a quixotic effort to prevent all conversations that did not relate directly to work, or (as is more likely) tried to forbid conversation on just one topic, as in *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 777 F.2d 1046, 1053–55 (5th Cir.1985), the First Amendment might be violated. *Id.*; see also *Los Angeles Teachers Union, Local 1021 v. Los Angeles City Bd. of Education*, 71 Cal.2d 551, 78 Cal.Rptr. 723, 455 P.2d 827 (1969). The curtailment of free speech would be slight, perhaps, but the justifications would be even slighter; in particular there could be no argument that the employer was being involuntarily associated with the employees' opinions, a danger in the present case. But as this last observation underscores, a private conversation has a different significance from a regularly scheduled group meeting devoted to a particular subject. Not only is it more difficult for a school administration to monitor private conversations, but they do not create the same danger of injecting the school into undesired controversy on matters remote from its educational mission. A public employer does not, by permitting its employees to use their lunch breaks or coffee breaks or other down time during the workday to talk to each other, turn over its premises to the employees for organized and scheduled meetings on topics unrelated to work. Just because like other workers they can converse on varied topics during slack periods of work or breaks between work, public employees do not obtain squatters' rights to take over the employer's property and turn it into Hyde Park corner or town hall. Mrs. May does not argue that private citizens of southern Indiana have a constitutional right to hold meetings in Harper Elementary School between 7:25 and 7:45 a.m. every Tuesday or any Tuesday, and we have trouble understanding why she should have such a right just by virtue of being employed there. Civil servants are a protected class by virtue of decisions such as *Pickering*, but they are not yet a privileged class.

Admittedly there is no sharp line between a private conversation and a group meeting, and there is a question on which side this case falls. Mrs. May's group has no name, no charter, no bylaws, no affiliation with an established organization, and only six or seven members, and went undiscovered for almost three years. The group started with three members: what if it had started with two and stayed there? What if it had met in an unused office during the lunch break? What if two Roman Catholic teachers recite the Angelus every noon in unison? (We assume in all of these examples that the students are unaware of these activities, so that objections based on the establishment clause of the First Amendment are minimized.) But these are not entirely apt analogies. Before it tried to go public, Mrs. May's group already comprised almost 25 percent of the school's teaching staff; many a local bargaining unit has only seven members, yet is a group with jural status, see, e.g., *NLRB v. Res-Care, Inc.*, 705 F.2d 1461, 1469 (7th Cir.1983); and notices of private conversations do not appear in newsletters. The long line of constitutional decisions dealing with permit requirements for holding meetings of various sorts in public parks (see citations in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 n. 2, 89 S.Ct. 935, 938 n. 2, 22 L.Ed.2d 162 (1969)) reflects the fact that a "meeting" is an intelligible concept, a criterion of legal regulation, and a thing distinct from a private

conversation. In any event Mrs. May makes no issue of the definition of a meeting or a group. She does not want her group to be limited to seven members; that is why she wanted to put an announcement in the newsletter. Her briefs describe these gatherings as group meetings, an appropriate if not inevitable characterization. The defendants were entitled to treat them as such, and to forbid them without also trying to forbid private conversations about religion, and private prayers, on school premises.

We are reluctant in any event to create a new constitutional right on the basis of the nine pages of argument devoted to this subject in Mrs. May's main brief. She makes no effort to show that entitling public employees to use the workplace for meetings is necessary to plug a hole in the First Amendment's expansive protections of free speech. There are other places where six or seven teachers can meet weekly to discuss religion, beginning with the teachers' homes. Instead of getting to school as early as they do they can meet at one of those homes before going to school. If this would extend their commuting time too much (which would depend on where their homes are located in relation to the school and each other, a matter on which the record is silent), they can meet in the afternoon after school lets out, or in the evening, or on weekends. True, since they have to be in school anyway, the school is the most convenient location for their meetings; driving time and expense are minimized. And although there is a drawback, in that the choice of this location limits participation to persons who happen to work at this particular (and not large) school, it cannot be too serious, for the alternative locations are open to Mrs. May's group, which by forgoing them has revealed its preference for the school. Nevertheless the overall advantage to the group of holding these meetings in the school, and the resulting increment in free speech, may well be less than the costs to the school of allowing its premises to be used for meetings unrelated to school business.

The issue, we repeat, is not the incremental costs of electricity and maintenance; these we assume are zero. It is the controversies and distractions in which the school could become enmeshed if it allowed its teachers to hold meetings unrelated to work. Evangelical prayer meetings may or may not be controversial in the Evansville area; the record contains nothing on the question. We can think of a lot of meetings, though, that would engender intense controversy. A meeting of the Ku Klux Klan, for example (later we shall cite a case where school authorities were forced to allow a meeting of the Ku Klux Klan to be held at the school because they had allowed meetings of other groups to be held there); or of a group advocating special legal protections for homosexuals; or of advocates or opponents of abortion, or communism, or racism, or nudism. Since the Harper School has only 30 teachers, the opportunities for controversy are inherently limited if the meetings are limited to employees, but they are not negligible, and they suggest that the benefits to the employer from forbidding employees to hold meetings on the employer's premises to discuss matters unrelated to work may be significant.

We do not mean to suggest that the district judge made a finding that the costs of these meetings would outweigh the benefits, or that we have made such a finding. We are merely trying to explain our reluctance to adopt a novel principle of law that would require public employers to turn their premises over to employees for meetings on subjects unrelated to the employer's business. The plaintiff has not made a case for such an expansion in First Amendment rights. The costs to the employer seem high and the benefits to the interests protected by the First Amendment modest. In these uncertain circumstances we are reluctant to intervene, particularly in a decision of local school authorities. In today's contentious atmosphere the administration of a public school is difficult enough without a federal court's telling school administrators that in addition to running a

school they must provide a forum for their employees to hold meetings on the political, social, and religious issues of the day.

We are particularly disinclined to intervene given Mrs. May's failure not only to offer argument beyond a mechanical extrapolation from the *Pickering* lines of cases but also to offer any evidence in the district court that preventing her group from meeting on property owned by the school district will significantly reduce freedom of speech because of the lack of an alternative forum. We do not mean "evidence" just in the sense of characteristic trial-type evidence that must be attested and is subject to cross-examination. We mean anything that might be pertinent to deciding what the rule of law should be. Mrs. May has offered nothing. As we shall see, she does not want a trial at which she might make a factual showing of the need for constitutional protection in this case. She has rested her case on the analogy to *Pickering*.

■ *Tinker v. Des Moines Independent School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), does not close the gap. The public school students who were held in that case to have a constitutional right to wear armbands in school protesting the Vietnam War were not employees and were not seeking to hold meetings on public property. They were in the school under the compulsion of the school law and retained their rights of free speech to the extent compatible with the needs of school discipline—as do other involuntary guests of the government, such as prison inmates. See, e.g., *Procunier v. Martinez*, 416 U.S. 396, 412–14, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974). Public school teachers, too, we may assume without having to decide, have some rights to express themselves in the classroom, though not because they are there under compulsion, for of course they are not. Academic freedom, we may assume, is not exclusively a prerogative of the academic institution, though obviously a school has considerable authority over what teachers teach, a point well illustrated by *Solmitz v. Maine School Administrative Dist. No. 59*, 495 A.2d 812 (Me.1985). But the only issue of academic freedom in this case is the right of a public school to operate without interference from the federal courts. See *Piarowski v. Illinois Community College Dist. 515, supra*, 759 F.2d at 629, and cases cited there. Teachers do not exercise academic freedom when they meet before school opens for a prayer meeting from which students are carefully excluded. They pursue in this setting personal ends unrelated to their role as teachers. They may have limited First Amendment rights but not by virtue of being teachers, and those rights do not include the use of school premises for unauthorized meetings unrelated to teaching. *Friedman v. Union Free School Dist. No. 1*, 314 F.Supp. 223 (E.D.N.Y.1970), suggests a broader right for teachers than we are prepared to endorse, but even there the "speech" held to be protected (the circulation of union literature) was more closely related to teaching than anything here.

Mrs. May's second argument for reversing the district judge is that even if the school had no duty to allow teachers to hold meetings on school premises, it could not once it decided to allow meetings to be held on subjects unrelated to school business forbid only religious meetings. This might seem to be an argument about religious freedom but, surprisingly, it is not. Mrs. May does not argue that the prohibition of religious meetings in the school violated her right to exercise her religion freely. She does not argue that her religious beliefs require that she hold these prayer sessions on school premises or that the defendants are trying to discourage evangelical Christianity in particular or religious observance in general. She pitches her claim entirely on the free speech clause of the First Amendment. She argues that having permitted other groups to use the school for the expression of ideas the defendants cannot single out one type of expression—religious expression—and ban it. She cites *Widmar v. Vincent, supra*, where a university allowed more than 100 student groups to use campus facilities to

propagate their ideas, but forbade student religious groups to do so, and the Supreme Court held that having made the campus a public forum the university could not exclude religious speech from it. To the argument that the exclusion was not arbitrary because allowing student religious groups to use campus facilities would violate the establishment clause, the Court answered that it would not violate it, and the defense therefore failed. We may assume without having to decide that it would fail here too; that a prayer meeting held before school opens and unknown to the students is not an establishment of religion.

■ The reference in the *Widmar* opinion to public forum may suggest that it is important whether the Harper School is a public forum, but we are not at all sure of this. Not only is there a question whether the public forum doctrine is intended to apply to purely internal gatherings (for Mrs. May apparently does not wish to invite anyone to join her prayer group who is not an employee of the school); Mrs. May's specific contention—that the school discriminates arbitrarily against one type of speech, religious speech—would if true establish an abridgment of free speech however one classifies the Harper School along the range of public-private forum. And range it is. There are public forums and there are public forums. See, e.g., *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, — U.S. —, 105 S.Ct. 3439, 3449–51, 87 L.Ed.2d 567 (1985). There are the streets and the parks and the mails—traditional public facilities for the expression of ideas and opinions—and the power of the government to limit expression in these facilities is closely confined. There are also the so-called limited public forums, such as the municipally owned theater in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975), which was not a traditional public forum, because it is not traditional for municipalities to operate theaters; but having decided to create a public forum for theatrical presentations the municipality could not subject the theater to the type of censorship that had long been considered improper in public regulation of private theaters.

■ Finally, there is public property not intended to be a forum for the public expression of ideas and opinions. Here the government's authority to prevent such expression is almost complete and fails only when the government tries to suppress a particular point of view. Thus the government can regulate content in a nonpublic forum (see, e.g., *Lehman v. City of Shaker Heights, supra,* upholding a ban on political advertisements in the cars of a public transit system), as it could not do in the theater in the *Southeastern Promotions* case. It just cannot encourage or discourage a particular viewpoint, slant, or opinion on some matter of public concern. "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the Government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc., supra,* 105 S.Ct. at 3451 (citations omitted). A non-public forum is not necessarily a place of silence; it may still be a forum, as the term implies; it just is not a place generally open to the public. It does not lose its character as a nonpublic forum merely because outsiders are occasionally invited to speak. A college classroom (and *a fortiori* an elementary school classroom) does not become a public forum because a guest lecturer from the outside is invited to talk to the class. See, e.g., *Piarowski v. Illinois Community College Dist. 515, supra,* 759 F.2d at 629. A military base does not become a public forum merely because civilian speakers are occasionally invited to the base, and in *Greer v. Spock, supra,* the Supreme Court held that the authorities could forbid political speechmaking at the base.

Harper Elementary School is not a public forum. The public is not invited to use its facilities as a soapbox. The public is not invited in, period, which distinguishes this case from *New York City Unemployed & Welfare Council v. Brezenoff*, 677 F.2d 232 (2d Cir.1982), where the waiting rooms in welfare offices were given a very limited status as public forums. Teachers, of course, express ideas and opinions as part of their teaching, but that is just the sort of thing that does not turn a government building into a public forum. There is plenty of debate and discussion in the White House mess or, we suppose, the CIA's headquarters, but neither of these are public forums of either the traditional or new-fangled variety. See *NAACP Legal Defense & Educational Fund, Inc. v. Devine*, 727 F.2d 1247, 1272 (D.C.Cir.1984) (dissenting opinion), rev'd sub nom. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc., supra*. Teachers may have rights of free expression in the classroom, and students too, but not by virtue of the doctrine of public forums (a distinction made clear in *Texas State Teachers Ass'n v. Garland Independent School Dist., supra*, 777 F.2d at 1050–54). The school is not open to the public.

The rules governing public and nonpublic forums strike a balance between the interest in free speech and the countervailing interest in the efficient operation of government. In the traditional public forum the first interest is paramount, and in the nonpublic forum the second. This reinforces our earlier conclusion that public employees do not have a general right to commandeer the premises where they work for meetings devoted to the discussion of matters unrelated to their work. But even in a non-public forum, the government's interest in interfering with the free market in ideas through discriminatory restrictions on particular points of view (such as the religious) is slight, and the potential injury to this important market significant.

And yet we might, taking off from *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984), question the relevance of any sort of "forum" analysis to a case where government employees are seeking to use government premises for the communication of ideas and opinions to each other only, so that the public at large is not involved. But that will not be necessary. We shall assume without having to decide that Mrs. May has a cause of action if the defendants, while not obligated to allow teachers or anyone else to use school premises for meetings, in fact allowed the premises to be used for any meetings by teachers except prayer meetings. This would be a restriction discriminating against a particular point of view and would therefore flunk the test we quoted from *Cornelius*, provided that the defendants have no defense based on the establishment clause, and we shall assume they do not. The case would be just like *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Bd.*, 578 F.2d 1122 (5th Cir.1978). A school allowed outside organizations to use school facilities for meetings during hours when school wasn't in session, but drew the line at the Ku Klux Klan. This was a "selective denial of a dedicated public forum to a group because of its ideas or membership policies," *id.* at 1128, and was forbidden. We must decide whether this is a similar case; we must therefore decide whether as Mrs. May says only religious meetings were forbidden, or as the defendants say all meetings were forbidden, with immaterial exceptions such as meetings related to the business of the school.

Neither the Harper School nor the school district has a written policy regulating the use of school facilities for meetings unrelated to school business. And no attempt is made to prevent teachers from having informal discussions before or after school or during lunch or free periods on any subject they wish, whether or not related to school business. Every Friday morning before school opens there is a staff social gathering at which doughnuts and coffee are served to any teachers who attend, and they can talk about anything they want while eating and drinking. The collective bargaining agreement between the teach-

ers' union and the school district allows teachers to discuss labor relations on school premises. The school has been host to meetings of the P.T.A. (which of course is school related), the boy scouts, the girl scouts, "fine arts groups" not further defined, and "booster" clubs, which raise money for school athletic teams and thus are also school-related. The school is used as a polling place on election day. A religious group was permitted to use another school in the district for a time after its church burned down. Apparently no religious or political group other than Mrs. May's group had ever tried to hold a meeting at the Harper School, although student religious groups (one athletic—the record does not reveal the nature of the other) have twice been refused permission to use other school premises in the district. The school district has in fact an unwritten policy against allowing religious groups to meet on school premises whether or not they are school-related; the case of the church whose building had burned down was regarded as exceptional. The motivation for the policy is a desire to keep church and state firmly apart. No policy of forbidding nonreligious groups to use school property for meetings has been formulated, but on the other hand no such group (unless school-related) has ever been allowed to hold meetings at the school.

If Mrs. May were arguing that the district judge should not have granted summary judgment for the defendants, because there is a genuine issue of material fact on the question whether they are discriminating against religious speech, we might agree and reverse. See Fed.R.Civ.P. 56. The defendants have neither a formal policy of forbidding teachers to use school premises for meetings to discuss matters unrelated to the school nor a track record, consisting of refusals to allow such meetings, from which a policy could be inferred. The alleged policy may be an afterthought designed to rationalize a decision wholly motivated by a view (which may well be erroneous) that allowing religious meetings on school premises would violate the establishment clause even though the meetings

were held before school opened and there was no student participation in or even (it appears) student knowledge of them. What the defendants would have done if confronted by a request from the same teachers to be allowed to hold meetings of the local chapter of the Americans for Democratic Action or the Young Americans for Freedom is not the sort of issue normally determined on summary judgment. The sole attestation of a policy against opening school premises to meetings of nonreligious as well as religious groups came in the school superintendent's affidavit—filed three months after he had testified in his deposition only to a policy against allowing religious meetings to be held, and discordant with his deputy's testimony that the deputy knew of no policy applicable to organized activities of nonreligious groups. Moreover, Mrs. May never completed her discovery and she objected to discovery being cut off when it was.

But that Mrs. May may have succeeded in creating a genuine issue of material fact is irrelevant to this appeal, for she has waived her right to a trial and consented to the entry of judgment on the record made in the summary judgment proceedings. The fact that both sides moved for summary judgment is not the basis of our conclusion. By moving for summary judgment a party does not waive his right to argue that if the motion is denied the case must be tried. See 10A Wright, Miller & Kane, Federal Practice and Procedure § 2720 (2d ed. 1983); 6 Moore's Federal Practice ¶ 56.13 (2d ed. 1985). But sometimes both parties move for summary judgment because they do not want to bear the expense of trial but instead want the trial judge to treat the record of the summary judgment proceeding as if it were the trial record. In effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery. Cf. *Schlytter v. Baker*, 580 F.2d 848 (5th Cir.1978); 10A Wright, Miller & Kane, *supra*, § 2720, at pp. 26–27; 6 Moore's Federal Practice, *supra*, ¶ 56.13,

at p. 56–347. Apparently that is what happened here. Mrs. May's opening brief does not contend that there is a genuine issue of material fact warranting trial; it contends that we should grant summary judgment for her. This is not an alternative contention, with a trial as the backup request; it is the only thing she asks us to do (except for a remand to assess damages and formulate the injunctive decree). Her reply brief is even more explicit; it "prays that this Court enter an Order (a) reversing the judgment below, (b) granting Summary Judgment in favor of Plaintiff on the issue of liability, (c) directing that appropriate injunctive relief issue forthwith, and (d) remanding the case to the trial court for appropriate proceedings on the issue of damages."

Having no desire to trap Mrs. May in inartful pleadings we pursued at argument the question whether she was waiving any contention that the case should not have been resolved on summary judgment. Her lawyer was emphatic in stating that his client did not want a trial. That sounds like waiver to us. He said it in his opening argument and then, in rebuttal, having had a chance to ponder the question during the appellees' argument, said it again. He said it would be pointless to send the case back for a trial. He said it would just give the defendants a chance to polish their story that they were carrying out a nondiscriminatory policy when they told Mrs. May to stop her meetings.

So the issue for us is not whether there is a genuine issue of material fact concerning the defendants' policy toward the use of school premises for meetings unrelated to school business; it is whether the district court's findings concerning that policy are clearly erroneous. A preliminary question is whether those findings are clear enough to review. This is often a problem when a summary judgment proceeding, to which the requirement in Fed.R.Civ.P. 52(a) that the judge make findings of fact and conclusions of law does not apply, is converted into a bench trial, to which the requirement does apply. The judge made no explicit finding that the defendants have a

policy of forbidding all meetings on subjects unrelated to school business; the only explicit finding is that "the school board and the superintendent of schools had consistently applied a policy prohibiting use of school facilities *for religious activity.*" 615 F.Supp. at 763 (emphasis added). The judge went on to find that no other meetings of teachers had occurred at the Harper School that were not related to the operation of the school, but this is consistent with no other teachers' having wanted to have such meetings and is not a determination as to what the school would have done if other teachers had tried to hold such meetings.

However, elsewhere in the passage that we quoted earlier, the district judge said, "If other teachers groups were permitted to meet ..."—and indicated that they were not permitted by concluding, "The record reveals no such scenario." *Id.* at 764. All this is less clear than we would like; but since Mrs. May does not ask us to remand the case for further findings, we are entitled to draw reasonable inferences as to the judge's findings, and we infer that the judge indeed found that other groups would not have been permitted to meet, with the exceptions noted earlier. And this finding cannot be set aside as clearly erroneous. The fact that stands out from all others is that the Harper School, in contrast to the public schools involved in the *East Baton Rouge* case or in *Country Hills Christian Church v. Unified School Dist. No. 512,* 560 F.Supp. 1207, 1214 (D.Kan.1983), has never been used for meetings unrelated to the business of the school. Mrs. May asks us to speculate on the counterfactual proposition that if teachers belonging to a nonreligious group such as the Democratic Party or Planned Parenthood or the Committee on the Present Danger had asked to hold a meeting in the school, they would have been allowed to do so. She had the burden of proving this and failed to carry it. She argues that political subdivisions were permitted to use school facilities, but so far as appears this just means that the Harper

School was used as a polling place on election day. Especially since political meetings are forbidden at polling places, one cannot argue that by allowing the school to be used for polling, the defendants made it a public forum for political and religious discussion. She says that teachers were allowed to meet to discuss any subject but religion, but what the record actually shows is that no effort was made to monitor teachers' conversations in corridors, at lunch, and before and after school. As the deputy superintendent of schools testified, "I'm not aware of any organized activities in terms of gathering teachers together to discuss economics or politics. All of the questions you've asked previously along that line, I've responded in terms of teacher one, two, talking with each other in the halls or in the office or in one of the teacher's classrooms; but I know of no organized efforts along those lines." As we said earlier, there is a difference between informal conversations on the one hand, and regular meetings of an organized group for a purpose specified in advance, on the other. Only in a totalitarian society is an encounter between two employees at the water cooler deemed a meeting if the conversation happens to turn to politics or religion. By permitting such encounters a public employer does not dedicate its premises to the holding of regularly scheduled meetings on matters unrelated to school business. ·

The absence of a formal policy does not prove the absence of a policy. It would not be likely to occur to the principal of a small elementary school that political or religious groups would ask to use the school for meetings and that he ought to have some policy readied for the occasion. Apparently none ever had before Mrs. May's group. The school district is larger, of course. We are told that it has 35 school buildings. But apparently until the activities of Mrs. May's group came to light no group had asked to hold meetings unrelated to school matters in any of the buildings. Two religious youth groups had asked to use a high school and had been turned down; these would have been school-related—a signifi-

cant distinction, as we are about to see. A church whose building had burned down was allowed to use another school in the district for religious services, but this was so plainly an emergency situation that no need to formulate a general policy was felt. Few administrators deal with problems before they arise; their motto is, sufficient unto the day is the evil thereof. It would hardly occur to the average school administrator to think that when he allowed the girl scouts to use school premises he should be thinking what to do when the Ku Klux Klan asked to use those premises for its cookie sale, on penalty of having to pay damages if he thought wrong.

The strongest support for Mrs. May's position is the fact that the defendants were fearful of violating the establishment clause. Their concern, which may well have rested on an exaggerated view of the scope of the establishment clause, led them to deny the use of school premises to two religious groups one of which, at least, was school-related. This refusal might create interesting questions in a suit by such a group, modeled on the suit in *Widmar,* but that is not this suit; the fact that the record reveals a definite policy against religious meetings does not answer the question whether the defendants created a forum for speech and denied just religious groups access to it, and the weight of the evidence suggests not. The Harper School was not used for meetings unrelated to school business, assuming as we do that it is possible to distinguish private conversations from meetings and that the gatherings of Mrs. May's group were—as she acknowledges—meetings. There is no hint that any of the defendants is hostile toward religion in general or evangelical Christianity in particular, and on this record it would be speculation to find that they would have allowed Mrs. May to hold her meetings if only her subject matter had been politics rather than religion. The fact that the school district allowed a church to use a school building suggests if anything a partiality toward religion (though the church may have paid rent—the record is unclear

on this point). If so this would make it all the less likely that a political group would have fared better than Mrs. May's religious group if it had wanted to hold regular meetings in the Harper School. Maybe if it had been not a political or religious group but a cooking or exercise class the defendants would have reacted differently, but a school is not a public forum for teachers to express themselves on matters, unrelated to school business just because it has a gym or a kitchen. The issue is whether the defendants would have allowed groups interested in discussing matters unrelated to the educational mission of the Harper School to use school premises for regular meetings, and balked only at religion; and on this narrow issue the district judge was entitled to find that the plaintiff had not carried her burden of proof on a sparse record which however she does not want an opportunity to expand.

■■■■■ We emphasize that since a school is not a traditional public forum like the streets or parks, the plaintiff had to show that the officials in charge of it made it a public forum. It would not be enough to show that they had no crystallized, articulate policy against its being open to the public. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc., supra,* 105 S.Ct. at 3449. A school is not presumed to be a public forum, see, e.g., *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)—and the fact that this school had never in fact been used for meetings not related to school business created, indeed, the opposite presumption.

■■■■ The plaintiff is the master of his (in this case her) case. She has staked her all on persuading us to hold that the free speech clause of the First Amendment gives teachers and other public employees a broad right to hold meetings on their employers' premises. We do not think the free speech clause confers such a right and we are sure that the plaintiff has abandoned any effort to get a trial on the issue whether her employer singled out religious discussion for exclusion from what was otherwise an open forum for teachers to express themselves. It is possible that the defendants are discriminating against religious speech—that they would have allowed nonreligious groups to meet to discuss matters unrelated to school business—but this record does not prove it and Mrs. May has declined the opportunity to compile a fuller record. We cannot review her litigating strategy. The judgment for the defendants is

AFFIRMED.