**Christopher A. PFEIFER, Plaintiff,**

v.

**CITY OF WEST ALLIS, Defendant.**

No. 99–C–0653.

United States District Court, E.D. Wisconsin.

April 10, 2000.

Mathew Staver, for plaintiff.

Sheryl Kuhary, Milwaukee, WI, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Christopher A. Pfeifer brings this action under 42 U.S.C. § 1983 to challenge the refusal of defendant City of West Allis to permit him to use a meeting room in the public library ("Library") to present a program on creationism. Creationism is a religious doctrine based on an interpretation of the Bible, which purports to explain the creation of the universe and human life. Plaintiff's version of creationism rejects Darwin's theory of evolution, which holds that over a period of billions of years species evolved into other species ultimately resulting in human beings. The Library denied plaintiff's application to use the meeting room based on its policy that the room could not be used for religious services or instruction.

In this lawsuit plaintiff contends that defendant violated his rights under the First and Fourteenth Amendments to the Constitution and seeks declaratory and injunctive relief. The court has jurisdiction under 28 U.S.C. § 1331 and venue is proper under 28 U.S.C. § 1391(b). The parties have stipulated to the facts, and both parties have moved for summary judgment.

### I. FACTUAL BACKGROUND

In 1999 plaintiff founded the Genesis Commission, a nonprofit Christian instruction organization, consisting of plaintiff and his son. Plaintiff operates the organization out of his home. The purpose of the Genesis Commission is to "educate the public" about creationism. (Joint Stipulation of Undisputed Facts (hereafter "Jt.Stip.") ¶ 9.) Plaintiff's instruction relies heavily on the Bible. Plaintiff also uses bones and rocks to illustrate his contention that scientific evidence supports his view that God created the universe through a series of events.

Defendant maintains the Library, which has a meeting room known as the Constitution Room ("Room"). The Library occupies approximately 50,000 square feet and possesses about 190,000 books, including books on religion and politics. (Mulvey Dep. at 46–47; Jt.Stip. ¶ 41.) The Library's mission statement provides that: "The purpose of the West Allis Public Library is to provide members of the Community with access to materials and services which can improve their minds, broaden their lives, and fulfill their cultural, civic, intellectual, educational and recreational needs." (Jt.Stip.¶ 18.) The Library's policy statement governing use of the Constitution Room provides:

*POLICY STATEMENT*

The West Allis Public Library's large meeting room is designed primarily for use by the Library in programming efforts designed to meet the Library's goal.

*USES—PRIORITIES*

The large meeting room is made available for public programs sponsored by nonprofit educational and cultural agencies consistent with the mission of the Library:

Priority 1—The Library's own programs or programs in which the Library is a sponsor, participant or cooperative agency (e.g. discussion groups, Friends of the Library, etc.).

Priority 2—ETN and other educational programs sponsored by UW–Extension, UW Milwaukee and other public educational institutions.

Priority 3—Programs open to the public which are sponsored by local nonprofit organizations.

Priority 4—All other programs which meet the use requirements set forth above.

(*Id.* ¶ 16.) In 1992 the Library board amended the policy to add under "USES—PRIORITIES," "Official meetings, programs and activities sponsored or conducted by the City of West Allis Department/Divisions and administration." (*Id.* ¶ 17.)

The Library also requires that meetings in the Constitution Room be open to the public and free of charge. Library regulations state that the Library "desires to encourage wide availability of the room to local community organizations and agencies when the room is not required for Library programming." (*Id.* ¶ 16.) Therefore, only limited use of the Room is available to any one organization.

The Library excludes from use of the Room: "1. Meetings that are politically partisan. 2. Religious services or instructions. 3. Commercial sales or presentations promoting specific companies or products. 4. Regular meetings of clubs, groups or organizations etc.—not to include educational or cultural activities open to the general public that are sponsored by the clubs, groups, organizations, etc." (*Id.*)

In order to use the Constitution Room an organization must fill out an application form, which asks among other questions whether the applicant group is a nonprofit organization, whether it is a cultural or educational nonprofit organization and the purpose of the meeting. (Mulvey Dep.Ex. 3.)

Defendant's affirmative action statement provides that "[t]he City of West Allis does not discriminate against individuals on the basis of race, color, religion, age, marital or veterans' status, sex, national origin, disability, or any other legally protected status in the admission or access to, or treatment or employment in, its services, programs, or activities." (Jt.Stip.¶ 19.)

Over the past several years many organizations have used the Constitution Room. In 1997 the Library approved applications from the Wisconsin Humane Society, Parent Education Project of Wisconsin, Parents Without Partners, Citizens for Public Dog Parks, Heritage American, Allis Gardeners, Baseball Foundation of Wisconsin and Best in the Vest. (*Id.* ¶ 25.) In the same year the Library denied three applications: from the Heartland Organization because its purpose was to sell legal services; from the local Republican club because of the policy of excluding partisan political meetings and because the group requested use of the Room for regular meetings; and from the Association for Research & Enlightenment (A.R.E.) because the group wished to carry out religious activity relating to Edgar Cayce. (*Id.* ¶ 26.)

Since approximately January 1, 1998, the Library approved use of the Constitution Room for meetings of the following organizations: the Milwaukee Amateur Radio Society, PTA Reflections Art Display, Big Brothers/Big Sisters, Milwaukee County Genealogical Society, Home Schoolers History Fair, Friendship Force, Cub Scouts, Wisconsin Jaycees, Children's Department Program, Wisconsin Education Association, Heritage Antique Club, Special Olympics, Wisconsin Veterinary

Technician Association, West Allis Health Department, Tiger Scouts Organization, SHARE Program, Women's Club of West Allis, Milwaukee County Foster Parent Program, Woman's Club, Children's Service Society and MCFLS State of the Art Software Committee. The above organizations did not complete applications in 1999 because they already had applications on file. (*Id.* ¶ 22.)

The Library also approved other requests for use in 1998 including requests from the National Association of Investment Clubs, Milwaukee Metropolitan Sewerage District, Youth Incorporated/Kids TV, Wisconsin Humane Society, Milwaukee County Department of Human Services, American Lung Association of Wisconsin, the Bureau of Legal Services of the Wisconsin Department of Natural Resources, Talk to the Animals and Wisconsin Early Childhood Association. (*Id.* ¶ 24.)

In 1999 the Library approved applications from the following organizations: the Wellness Committee, Mary Warren Knight Chapter of the Daughters of the American Revolution, United States Postal Service and Wisconsin Humane Society. (*Id.* ¶ 23.) As of July 13, 1999, the Library had two pending applications that had been approved for use including, but not limited to, a seminar on Y2K and prophecy by an organization known as the Christian Civil Liberties Union. (*Id.* ¶ 21.)

Additional facts regarding some of the applicants will be stated later in this decision.

On April 14, 1999 plaintiff completed an application to use the Constitution Room and submitted the application to Jan Narlow, the Library administrative assistant. Plaintiff informed Narlow that his workshop had a religious content, that it was Christian in nature and Biblical, and that he taught out of both science textbooks and the Bible. The application indicated that the Genesis Commission, a not-for-profit educational organization, wanted to hold a "creation science workshop" that would be "open to the public" on June 16, 1999 from 7:00 p.m. to 8:30 p.m. (*Id.* ¶ 30.) Dennis Mulvey, the Library director, denied plaintiff's application because his proposed workshop involved religious instruction. (*Id.* ¶ 31.) Plaintiff appealed the denial to the Library board, which affirmed the director's decision. Under Library policy a program could be presented on evolution but a program on creation from a religious instruction viewpoint could not be presented. The Library contains books on the topics of religion, politics, evolution and creation. (*Id.* ¶ 41.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Both parties agree that there are no genuine issues of material fact and that the case should be resolved by way of motions for summary judgment.

## III. APPLICABLE LAW

A plaintiff can recover under 42 U.S.C. § 1983 if he can show that he was deprived of rights guaranteed by the Constitution or laws of the United States by a person acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908,

68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In the present case it is undisputed that when defendant denied plaintiff the use of the Constitution Room, defendant was acting as a person under color of state law. The issue presented is whether plaintiff was deprived of a constitutional right.

More specifically, the question is whether the First Amendment entitled plaintiff to use the Room for his program on creationism. The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause generally forbids government from circumscribing an uninhibited "marketplace of ideas." *See CBS, Inc. v. Federal Communications Comm'n*, 453 U.S. 367, 395, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981). Religious speech is protected by the First Amendment. *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

The First Amendment applies to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Defendant is a governmental body and thus subject to the constraints of the First Amendment.

■ In order to determine the extent to which a person may engage in expressive activity on government property the Supreme Court generally engages in what is known as "public forum" analysis. Limitations that the government may lawfully place on classes of speech vary depending upon whether the relevant forum is determined to be a traditional open forum, a public forum created by government designation or a nonpublic forum. *Chicago Acorn v. Metropolitan Pier Auth.*, 150 F.3d 695, 699–700 (7th Cir.1998).

■ A traditional public forum has been defined to include places such as streets, parks and malls—traditional public facilities for the expression of ideas and opinions. *May v. Evansville–Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1113 (7th Cir. 1986). In a traditional public forum the government may constrain expressive activity only in rare instances. A restrictive regulation based on the content of a speaker's message is subject to strict scrutiny and is valid only when both necessary to further a compelling state interest and narrowly drawn to achieve its purpose. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Reasonable content-neutral time, place and manner restrictions are permissible in a traditional public forum. *See id.* at 45, 103 S.Ct. 948.

■ A designated public forum consists of public property that the state has opened for use by the public as a place for expressive activity. *Id.* A state creates a designated public forum by opening up a nontraditional site for expressive activity. *Chicago Acorn*, 150 F.3d at 699. Unlike a traditional public forum, the dedication of a designated public forum to the public can be revoked. *Id.* Further, a dedicated public forum may be created for a limited purpose such as use by certain groups or for the discussion of certain subjects, and its subject matter can be limited in accordance with the character of the forum. *Perry*, 460 U.S. at 46 n. 7, 103 S.Ct. 948; *see Chicago Acorn*, 150 F.3d at 700; *see, e.g., Widmar*, 454 U.S. at 267–68 & n. 5, 102 S.Ct. 269 (1981) (university facilities held to be public forum for students but not nonstudents); *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175 n. 8, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting held to be public forum for discussion of matters relating to schools); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (publicly owned theater held to be public forum for theatrical performances); *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir. 1996) (senior citizens' center open to the public but only for discussion of subjects of interest to the elderly); *Piarowski v. Illi-*

*nois Community College Dist. 515,* 759 F.2d 625, 628–29 (7th Cir.1985) (public college's exhibition area limited to members of college community).

■ As long as a government retains a dedicated public forum, it is bound by the same standards as apply in a traditional public forum. Content-based exclusions must be narrowly drawn to effectuate a compelling state interest, but reasonable time, place, and manner regulations are permissible. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948.

■ If a designated public forum is limited to certain kinds of speakers or to the discussion of certain subjects it is sometimes called a limited public forum. *See Perry,* 460 U.S. at 45 n. 7, 103 S.Ct. 948; *Kreimer v. Bureau of Police,* 958 F.2d 1242, 1261 (3d Cir.1992). If a regulation of speech in a limited public forum restricts speech of the type permitted in the forum it is subject to strict scrutiny whereas if it restricts speech of the type excluded from the forum the regulation must only be reasonable and viewpoint neutral. *May,* 787 F.2d at 1113.

■ Public property that is not either a traditional public forum or a dedicated public forum falls into the residual category of nonpublic forums. *Chicago Acorn,* 150 F.3d at 700 (citing *Perry,* 460 U.S. at 46, 103 S.Ct. 948). These are facilities that are not open to the general public although they are sites usable and sometimes used for discussion and other expressive activities. *See May,* 787 F.2d at 1113. In a nonpublic forum courts give great weight to the government's desire to preserve the property for its intended, usually limited use. Regulation of speech in a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

The Seventh Circuit has recently expressed interest in approaches other than public forum doctrine for resolving questions of access to public property for the purpose of expressive activity. *See Chicago Acorn,* 150 F.3d at 695 ("What is particularly interesting about Justice O'Connor's swing opinion [in *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 684–85, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ] is that it blurs the line between the public and nonpublic forum, suggesting a sliding-scale approach— a standard versus a rule or categories—in which the benefits and costs of free speech are balanced in particular settings."); *Hedges v. Wauconda Community Unit Sch. Dist. No. 118,* 9 F.3d 1295, 1300 (7th Cir.1993) ("Whether the increasing complexity of public forum doctrine has more to offer may be doubted."); *see also Cornelius,* 473 U.S. at 821, 105 S.Ct. 3439 (Blackmun, J., dissenting) ("Rather than ... balancing the First Amendment interests of the speaker ... against the interests served by reserving the property to its normal use, the Court simply labels the property and dispenses with the balancing.").

Nevertheless, the rules governing public and nonpublic forums are themselves intended to strike a balance between the interest in free speech and the countervailing interest in the efficient operation of government. In the traditional public forum, the first interest is paramount and in the nonpublic forum, the second. *May,* 787 F.2d at 1114. And public forum analysis remains the approved method of assessing the relative weight of these interests.

In the present case, both parties agree that the Constitution Room of the West Allis Public Library is not a traditional public forum. The disputed issue is whether as a result of defendant's actions it became a designated public forum.

The original concept of what has been termed the "transformation principle,"

whereby government by affirmative action transforms a nonpublic forum into a designated public forum, was developed in two 1981 Supreme Court decisions: *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), and *Widmar.* In *Heffron,* the Court held that the state's invitation to the general public to use a fairground for certain purposes transformed it into a designated public forum where heightened scrutiny applied. *Heffron,* 452 U.S. at 655, 101 S.Ct. 2559. In *Widmar* the Court established this concept more clearly, holding that even though a university had adopted a policy prohibiting student religious groups from meeting in university facilities, by permitting a wide variety of student groups to hold meetings in such facilities, the university had created an open forum for student groups. *Widmar,* 454 U.S. at 267, 102 S.Ct. 269. Thus, the university could not constitutionally exclude student religious groups from using the meeting rooms. *See id. See generally* Rosemary C. Salamone, *Public Forum Doctrine and the Perils of Categorical Thinking: Lessons from Lamb's Chapel,* 24 N.M.L.Rev. 1, 18 n. 60 (1994).

In *Cornelius,* the Supreme Court further explained the process by which a nontraditional site became a public forum:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. For example, in *Widmar*

*v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), we found that a state university that had an express policy of making its meeting facilities available to registered student groups had created a public forum for their use. The policy evidenced a clear intent to create a public forum, notwithstanding the University's erroneous conclusion that the Establishment Clause required the exclusion of groups meeting for religious purposes. Additionally, we noted that a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum.

*Cornelius,* 473 U.S. at 802–03, 105 S.Ct. 3439 (citations omitted).

The *Cornelius* Court's emphasis on governmental intent as the critical factor in determining the existence of a public forum has been the subject of criticism. *See, e.g., United States v. Kokinda,* 497 U.S. 720, 737–38, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (Kennedy, J., concurring) ("[B]ecause of the wide range of activities that the Government permits to take place on this postal sidewalk, it is more than a nonpublic forum. This is so even though the Government may intend to impose some limitations on the forum's use. If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case."); *see also* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum,* 34 UCLA L.Rev. 1713, 1756–57 (1987) ("If a limited public forum is neither more nor less than what the government intends it to be, then a first amendment right of access to the forum is nothing more than the claim that the government should be required to do what it already intends to do in any event.").[1]

---

1. Post argues that the critical, if unstated, factor that courts consider in determining whether a forum is public or nonpublic is the nature of the authority that government is exercising. In analyzing governmental restrictions on speech Post distinguishes between governance and management. Governance occurs when government regulates the speech of the general public as in the case of a traditional public forum such as streets or

Nonetheless, the factors that determine whether a forum is public or nonpublic remain those set forth in *Perry* and *Cornelius,* and it is those factors which I apply to the facts before me. The first relevant factor is governmental intent. I evaluate "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. The nature of the property and its compatibility with expressive activity provide additional information bearing on intent. *Id.* at 802, 105 S.Ct. 3439. A second relevant factor is the extent of use granted. I look at defendant's policy and practice to determine how widely use of its facilities is open or whether it has been limited by well-defined standards tied to the nature and function of the forum. *Perry,* 460 U.S. at 46–47, 103 S.Ct. 948.

Government does not create a public forum merely by " 'permitting limited discourse' " but rather by " 'intentionally opening a nontraditional forum for public discourse.' " *Kokinda,* 497 U.S. at 730, 110 S.Ct. 3115 (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439); *see also Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (the government opens a designated public forum where "by policy or practice [it permits] indiscriminate use by the general public … or by some segment of the public" (internal quotation marks omitted) [2]). Defendant must have thrown the "site open for a range of expressive purposes." *Chicago Acorn,* 150 F.3d at 699. The question ultimately is whether defendant "opened its doors wide enough," *Hedges,* 9 F.3d at 1300, to make the Constitution Room a public forum.

## IV. ANALYSIS

### A. Forum Analysis

Before commencing the analysis it is important to identify precisely what physical area is at issue. In identifying the forum I consider the access sought and the particular activity proposed. *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439. Plaintiff requested access to the Constitution Room of the Library for purposes of presenting a program. Thus, the Constitution Room is the relevant forum. However, when considering the *Cornelius* factors such as compatibility of the forum with expressive activity, it is obviously relevant that the Constitution Room is in a public library as opposed to some other type of governmental property. *See, e.g., Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (relevant that streets and sidewalks at issue were inside an enclosed military installation).

### 1. Library Policies Governing Use of the Constitution Room

The operative policy statements governing the Constitution Room indicate an intent on defendant's part to open the Constitution Room to a broad range of expressive activity. The Library's mission statement, which, according to its di-

---

parks. In such situations courts will be more likely to find that government has created a public forum. When government restricts speech in the course of managing its own internal affairs and where such restriction may be necessary for a governmental body to function effectively government exercises managerial authority. In these situations courts will give greater weight to administrative concerns and be less likely to find the existence of a public forum. *See id.; see also* Lillian R. Bevier, *Rehabilitating Public Forum Doctrine: In Defense of Categories,* 1992 Sup. Ct.Rev. 79, 112.

2. "Indiscriminate" does not mean that all First Amendment activities must be permitted in any designated public forum. The Supreme Court's own decisions would undermine this construction as it is unlikely that the Court in *Southeastern Promotions,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448, would have required the government to permit speeches and leafleting in the municipal auditorium, although it deemed the auditorium to constitute a designated public forum. *See Kreimer,* 958 F.2d at 1260 n. 18.

rector, applies equally to the Constitution Room, is very broad and states that the Library's mission is to serve the "Community." (Jt.Stip.¶ 18.) The policy governing the Room states that the Room is "available for public programs sponsored by nonprofit educational and cultural agencies consistent with the mission of the Library." The policy further indicates that "the Library Board desires to encourage wide availability of the room to local community organizations and agencies." (*Id.* ¶ 16.) The application form for use of the Room requires that the applicant be a nonprofit of either a cultural or educational type. These statements make clear that the Library intended the Constitution Room to be a forum for expressive activity by nonprofit organizations serving the West Allis community.

The emphasis on serving the community gives the present case a resemblance to *Grace Bible Fellowship, Inc. v. Maine School Administrative District No. 5*, 941 F.2d 45, 48 (1st Cir.1991). There, the plaintiff, a nonprofit religious organization, brought an action to compel the defendant school district to lease its facilities for a free community Christmas dinner accompanied by religious speech. The school district's mission was to serve the community, but the district's policy prohibited use of school facilities for religious purposes. The First Circuit held that a mission of community service was a broad one, more encompassing than that of educating children. The court went on to define "community" as "the neighborhood, the public" and concluded that the school district had created a designated public forum for groups in the community. Therefore, the district's policy of excluding groups with a religious message was subject to strict scrutiny and could not survive.

The Library's mission and policy statements reflect an intent not only to serve the community but also to provide information on a broad range of subjects. According to the mission statement, the Li-

brary is to "provide members of the Community with access to materials and services which can improve their minds, broaden their lives, and fulfill their cultural, civic, intellectual, educational and recreational needs." (Jt.Stip.¶ 18.) Thus, the Library aspires to provide information on virtually all subjects. This ambitious goal suggests a kinship with a traditional public forum, i.e., a "public facility for the expression of ideas and opinions." *May*, 787 F.2d at 1113; *see also Widmar*, 454 U.S. at 267 n. 5, 102 S.Ct. 269 (for students at the least, university campus came to possess many characteristics of traditional public forum). It is not unreasonable to regard expressive activity of a religious or political nature as consistent with improving minds, broadening lives and fulfilling cultural, civic and intellectual needs.

Notwithstanding the Library's broad mission, its regulations exclude certain activity from the Constitution Room. First the regulations exclude "regular meetings" of organizations. (*Id.* ¶ 16.) The reason for this exclusion is to "encourage wide availability of the room to local community organizations." (*Id.*) This exclusion is a content-neutral restriction of the time, place and manner type and has little relevance to forum analysis except that it reiterates the Library's intention to encourage wide use of the Room. The regulations also exclude "commercial sales" presentations. (*Id.*) This restriction, however, is very narrow in that Library policy limits use of the Room to nonprofit organizations. Nonprofits do not usually make commercial sales presentations.

Library regulations exclude two categories of expressive activity of the type that some nonprofits might typically engage in: "meetings that are politically partisan" and "religious services or instructions." (*Id.*) The "politically partisan" exclusion is also a narrow one because it covers only a small subcategory of political speech. The regulations do not define the phrase, "meetings that are politically partisan,"

but the apparent intent is to cover political party meetings. *See Webster's Third New International Dictionary of the English Language Unabridged* 1647 (1986) (defining "partisan"). Thus, the exclusion appears to leave untouched a substantial amount of political speech, including discussion of all manner of controversial subjects such as abortion, homosexuality, flag burning, school prayer and race relations, so long as the speech does not occur at a politically partisan meeting.

The exclusion of "religious services or instruction" also appears to cover only some religiously oriented speech.[3] The regulation would seem to permit religious discussion which does not rise to the level of services or instruction.

Thus, the Library's intent, as manifested in its governing policies, was to encourage a broad range of expressive activity by nonprofit groups in the Constitution Room. Its goal was to serve the community and to provide information to community members on a wide array of subjects. At the same time the policy excluded some narrow categories of speech.

### 2. Library Practice With Respect to the Constitution Room

The Library's intent to open the Constitution Room to nonprofit organizations for a wide range of expressive activity is reflected in the number and variety of groups whose applications to use the Room have been approved. As stated above, numerous and diverse organizations have used the Constitution Room. In fact, the record indicates that any nonprofit, not in an excluded category, is permitted to use the Room. Since 1997 only three other applications have been turned down, one from the local Republican club, one from a religious group, and one from an organization selling legal services.

The Library's practice of granting access to a large number of diverse groups makes the present case factually similar to *Concerned Women for America, Inc. v. Lafayette County*, 883 F.2d 32 (5th Cir. 1989). There, the plaintiff, an evangelical women's organization, sought to use the auditorium of a public library for a religious meeting. The library's access policy provided that the Library was

> open for use of groups or organizations of a civic, cultural or educational character, but not for social gatherings, entertaining, dramatic productions, money-raising, or commercial purposes. It is also not available for meetings for social, political, partisan or religious purposes, or when in the judgment of the Director of Branch Librarian any disorder is likely to occur.

*Id.* at 33.

The librarian testified that once she determined that a group would not be meeting for a religious or political purpose and that there was room on the calendar she would grant permission to use the auditorium. The defendant library argued that because it consistently denied access to religious and political groups, its decision to exclude the plaintiff did not violate the First Amendment. The Fifth Circuit disagreed and found that:

> The library has allowed the following groups, among others, to use the auditorium: (1) American Association of University Women (panel discussion on women in non-traditional occupations); (2) National Association of Retired Federal Workers (potluck luncheon and lecture on Alzheimer's disease); (3) U.S. Navy (closed meeting of area recruiters to discuss recruiting strategies); (4) United Way (discussion of funding requests and the organization's budget); (5) American Legion (regular post meeting); (6) Adult Program on AIDS (meeting on the topic of AIDS); and (7) Oxford Swim Club (general meeting at

---

**3.** Defendant's affirmative action policy bars religious discrimination with respect to "access to ... services, programs or activities."

One might argue that there is a conflict between the antidiscrimination statement and the religious speech exclusion.

which members discussed rules and policies for their pool). The library also gave permission for a young girl to use the auditorium for her piano recital. The narrow legal question before us is whether, by allowing these various groups to hold their meetings in the library auditorium, the library has created a public forum, and therefore must now allow access to other groups whose meetings have political or religious content, such as CWA. We agree with the district court's holding that CWA has shown a substantial likelihood of proving that the library has created a public forum by allowing diverse groups to use its auditorium.

*Id.* at 34.

Defendant argues that *Concerned Women* is distinguishable from the present case because there, while the library consistently denied access to religious and political groups, it nevertheless granted access to organizations having little to do with its educational and artistic mission. (Def.'s Reply Br. at 2–3.) Defendant's attempted distinction is unpersuasive. In the present case, beyond excluding groups covered by the exclusions, there is no evidence that the Library ever attempted to determine whether a proposed program was consistent with its mission. Nonprofits not in excluded categories were seemingly automatically granted access, or possibly the Library's mission "to improve ... minds, broaden ... lives, and fulfill ... cultural, civic, intellectual, educational and recreational needs" is so broad as to encompass almost any human activity.

For example, there is no evidence that the Library inquired as to whether or how a proposed program would serve "members of the Community." In fact, many of the organizations granted access appear to have little, if any, connection to the West Allis community. The Library approved applications from the National Association of Investment Clubs, the Wisconsin Education Association and the Baseball Foundation of Wisconsin. None of these applicants were from West Allis and their connection to West Allis, if any, is unclear. Possibly these organizations had information useful to residents in the community, but the Library made no inquiry on this point.

The Library also granted access to a number of organizations that, although not politically partisan, are politically active. One of the groups that used the Constitution Room, the Wisconsin Education Association, spent $389,451 lobbying the Wisconsin legislature in 1999. *See* Report of Wisconsin Ethics Board, titled *Lobbying Expenditures and Time Reported for 1999* (March 23, 2000) (available at <http://ethics.state.wi. us/forms-publications/forms/SLAE-time-n-money.pdf>, visited Apr. 7, 2000). Another, the Milwaukee Metropolitan Sewerage District, spent $151,558, and a third, the American Lung Association, spent $19,283. *See id.* In this respect the present case resembles *Gregoire v. Centennial School District,* 907 F.2d 1366, 1374 (3d Cir.1990), where the court pointed out that while the defendant school district attempted to justify its exclusion of certain political and religious speech from school facilities, the district permitted many politically active organizations to meet there.

The Library may also, in at least one instance, have paid less than careful attention to its ban on religious instruction. In 1999 it approved without inquiry an application to use the Constitution Room from an organization known as the Christian Civil Liberties Union to present a program on Y2K and prophecy. This program may very well have had religious overtones.

Thus, the Library's practice, like its policy, reflected its intent to encourage many diverse groups to use the Constitution Room. The Library only granted access to nonprofits, but it approved any nonprofit not within one of the narrow exclusions.

**3. Compatibility of Forum With Expressive Activity**

The next factor I consider in determining whether the Constitution Room is a

public or nonpublic forum is the nature of the property and its compatibility with expressive activity. *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. The Library's policy and practice of encouraging a large and diverse number of groups to use the Room indicate that the Room is compatible with expressive activity. Further, libraries are places compatible with a broad range of expressive activity, places dedicated to the pursuit of knowledge. *Brown v. Louisiana*, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). The West Allis Public Library contains over 190,000 books on a broad range of topics including religion and politics. In library reading rooms knowledge is gained through reading, writing and thinking. In library meeting rooms the medium of expression is oral communication.

Where the nature of the property is such that its principal function would be disrupted by expressive activity courts should be reluctant to find that government intended to designate a public forum. *See Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439 ("Accordingly, we have held that military reservations and jailhouse grounds do not constitute public fora." (citations omitted)). There is no evidence in the record that the Library is such a place.

In determining whether property was compatible with expressive activity the Fifth Circuit recently distinguished a library from a school building. *See Campbell v. St. Tammany's Sch. Bd.*, 206 F.3d 482 (5th Cir.2000). There, the Louisiana Christian Coalition challenged the defendant school board's building use policy for nonstudent groups wishing to use school facilities after hours. The policy permitted buildings to be used for civic, recreational and entertainment purposes open to the public, but prohibited partisan political activity, for-profit fundraising and uses involving "religious services or religious instruction." *Id.* at 483. The policy, however, permitted discussion of religious material or material containing a religious viewpoint. Plaintiff sought to use the building for, among other things, prayer and Biblical instruction.

The court said that "[a]t some point the allowance of a sufficiently wide variety of uses creates a designated public forum." *Id.* at 485. It further noted that the district's use policy "creates few limitations on use and skates close to establishing a designated public forum." *Id.* Nevertheless, the court found the restrictions "minimally sufficient to maintain the school buildings' status as a nonpublic forum." *Id.* The court, however, strongly suggested that had the building in question been a public library rather than a school the outcome would have been different. The court distinguished *Concerned Women* stating that, there, "the forum at issue was not a school, which is presumptively not a public forum unless the government designates it as such, but a public library." *Id.* at 487 n. 16.

Finally, as has been pointed out, the Constitution Room is widely used not only by Library personnel but also by the public. In this respect the Room resembles a traditional public forum. Although the Library has the right to use the Room for its own internal purposes whenever it wishes, the Room has also become a public resource. Further, the nature of the authority that government exercises when it deals with questions involving the public's use of the Room is similar to the kind of authority government exercises in connection with a traditional public forum. In Post's terminology the authority that defendant exercises is governance rather than management.

### 4. Conclusion Re: Forum Analysis

With respect to the Constitution Room the Library has created a sweeping latitude for public use. By policy and practice the Library permits all nonprofits to use the Room except where the content of the proposed program is within one of a few very narrow exclusions. The exclusion of commercial sales presentations is narrow because the forum is limited to nonprofits.

The "partisan political meeting" exclusion keeps out only a sliver of political speech and, while somewhat broader, the "religious services or instruction" exclusion covers only a portion of religious speech. Further, the Constitution Room is compatible with expressive activity. The Constitution Room is nearly as open as the forum established in *Widmar*.

The concept of the dedicated public forum describes public property used extensively for expressive activity and compatible with expressive activity. If a public facility used extensively for expressive activity and compatible with expressive activity can impose restrictions as narrow as those present here and nevertheless remain nonpublic, arguably the utility of the designated public forum concept as a category in First Amendment jurisprudence would be diminished. *See generally* Recent Case, 111 Harv.L.Rev. 1608, 1611 (1998) (commenting on *Bronx Household of Faith v. Community Sch. Dist. No. 10.*, 127 F.3d 207 (2d Cir.1997)); *see also Gregoire*, 907 F.2d at 1378 (commenting that no place would exist in the law "for the concept of the designated open forum [if] the government may ... pick and choose those to whom it grants access ... by framing its access policy to carve out even minute slices of speech which, for one reason or another, it finds objectionable").

Unlike the meeting rooms in *Chicago Acorn*, in which "selectivity and restriction" were the essence of the commercial strategy informing management, the West Allis Public Library threw the Constitution Room "open to the public for a range of expressive purposes." *Chicago Acorn*, 150 F.3d at 695. In doing so it "opened its doors wide enough" to have created a designated public forum for nonprofit organizations. *Hedges*, 9 F.3d at 1300.

## B. Justification for Excluding Plaintiff

A designated public forum is subject to the same rigorous standards as a traditional public forum. *Perry*, 460 U.S. at 46, 103 S.Ct. 948 ("Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."). A restrictive regulation based on the content of a speaker's message is valid only when such legislation is necessary to further a compelling state interest and is narrowly drawn to achieve its purpose. *Id.* at 45, 103 S.Ct. 948. If the distinction drawn is based on the religious content of the speech, the state must satisfy the standard of review appropriate to content-based exclusions. *Widmar*, 454 U.S. at 270, 102 S.Ct. 269. Here the parties do not dispute that plaintiff was excluded from the Constitution Room based on the religious content of his program.

■ As defendant recognizes, as it has been interpreted the Establishment Clause of the Federal Constitution,[4] which provides the legal basis for the separation of church and state, does not justify the Library's ban on religious instruction. Because the Library granted access to a wide variety of nonreligious private organizations, as in *Widmar*, there is no "realistic danger that the community would think that the [Library] was endorsing religion or any particular creed, and any benefit to religion or the Church would have been incidental." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).[5]

---

4. "Congress shall make no law respecting an Establishment of religion...." U.S. Const. amend. I.

5. The Wisconsin Constitution contains a differently worded provision prohibiting state support of religion than the United States Constitution. Article I, § 18 provides:

The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted,

■ Defendant does not advance any compelling state interest or, for that matter, any reason at all for the exclusion. When the Library director was asked about this at his deposition the following colloquy took place:

Q. And the religious services or instructions, why is that part of the policy? I know it's in the policy, but do you know the reason?

A. The reason would be to limit the use of the room to exclude religious services or instruction.

Q Do you know why that would be?

A. It was a board decision.

Q. Were you around when that decision took place?

A. No.

(Mulvey Dep. at 40–41.) It may be that the exclusion of partisan political meetings and religious services or instruction is based on the Library's desire to avoid controversy. However, the avoidance of controversy is not a valid ground for restricting speech in a public forum. *Cornelius*, 473 U.S. at 811, 105 S.Ct. 3439.[6]

or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries. Defendant does not argue that this provision is relevant to the present case. Also, I am unaware of any state court decision interpreting the provision in such a way as to even arguably affect the case before me. *See Widmar*, 454 U.S. at 275 nn. 15–18, 102 S.Ct. 269.

6. Because I have found that the Constitution Room is a designated public forum rather than a nonpublic forum and that the exclusion of plaintiff based on his religious message was a content-based restriction unsupported by a compelling state interest, it is unnecessary for me to determine whether the restriction was reasonable and whether the exclusion of a program on creationism constitutes viewpoint discrimination. I would need to address these questions if I had found the forum to be nonpublic. *See, e.g., Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207 (2d Cir.1997) (Cabranes,

## V. CONCLUSION

The Library's Constitution Room is a designated public forum, and no compelling state interest has been advanced to support the exclusion of plaintiff from using it.

Defendant suggests that a finding that the Constitution Room is a public forum may adversely affect the Library, possibly requiring it to open the Room to commercial sales activity or to restrict use of the Room to Library employees. (Def.'s Br. at 11.) The concern about commercialism, however, seems unfounded, both because the forum remains restricted to nonprofit organizations and because commercial speech is subject to a lower level of First Amendment protection than noncommercial expression. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). Also, I doubt that this decision will trigger requests to use the Room from organizations whose programs might disrupt Library functions. Concern by forum administrators about potentially controversial applicants is surely understandable, but it should not be an incentive to restrict communicative activity.[7] Moreover, the Li-

J., concurring in part and dissenting in part); *see also Campbell*, 206 F.3d at 485.

First, Campbell contends that the exclusion of religious services and religious instruction is viewpoint discrimination, not content discrimination. In *Lamb's Chapel v. Center Moriches Union Free School District*, the exclusion of a meeting on the subject permitted by a school district was unconstitutional because it was disallowed only because of the speaker's religious viewpoint. This does not mean that any ban on religious activities amounts to viewpoint discrimination. Religion may be either a perspective on a topic such as marriage or may be a substantive activity in itself. In the latter case, the government's exclusion of the activity is discrimination based on content, not viewpoint.

*Id.* at 485 (footnote omitted).

Plaintiff also makes other challenges to defendant's policy that are unnecessary for me to address.

7. *See generally* David Goldberger, *Judicial Scrutiny in Public Forum Cases: Misplaced*

brary's restriction on use of the Room for regular meetings remains in effect. And defendant is free to adopt any additional reasonable content-neutral time, place or manner restrictions it determines to be necessary.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment is **GRANTED** and defendant's cross-motion for summary judgment is **DENIED.**

**IT IS ORDERED** and **DECLARED** that defendant's exclusion of plaintiff from the Constitution Room violates the First and Fourteenth Amendments.

**IT IS ORDERED** that defendant is enjoined from denying plaintiff use of the Constitution Room to present a program on creationism.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment for plaintiff.